1885-2008 Lucent Technology v. Gateway Give the other side a few more seconds to get in place and then we'd like to begin. Counsel, good morning. Welcome to the court. Please proceed. May it please the court, Constantine Trella on behalf of Microsoft Corporation. With the court's permission, I'd like to begin with obviousness because I think the differences between the parties there are very discreet. They're pretty well identified in the briefs and I think can be reviewed pretty quickly. With respect to Claim 19 of the Day patent, Lucent first argues that there are no information fields being filled in the system described in the DataMation article. Mr. Trella, the big problem here, it seems to me, is you've got a jury verdict. We do have a jury verdict, Your Honor. There's no obviousness to the questions at all. They're underlying fact questions and the jury presumably resolved them. Well, the jury resolved them, Your Honor, but the jury resolved them incorrectly. As to the information fields issue, that's really quibbling about words, I think. The DataMation article talks about cells, cells that require information, information that is provided by on-screen tools, either lists of entries or an on-screen keyboard or numerical keypad. The article says that the data selected by the user is entered into the system. The only reasonable reading of that is that the data is entered into these cells, which are information fields. The term used in the Day patent is information fields. DataMation just uses different words. Some of the other issues really turn on fundamentally claim construction issues or what we think are lucent attempts to change the claim construction. For example, lucent claims that the DataMation system does not include graphical tools, but that's because lucent changes the claim construction to require something called graphics mode, which is found nowhere in the patent, nowhere in the claim construction. If you apply the claim construction, which is a graphical keyboard or number pad that the user can use to compose information by pointing to the displayed keys, it's clear that DataMation has that. You can see that in the picture from the article that's reproduced in the appendix. Also, there's a smaller version of it in our brief. Another instance where this claim construction revision comes into play is with the concurrent display requirement. Again, the picture from the DataMation article shows the normal meaning of concurrent display, which is at the same time. You have the one side with the various cells, the other side with the keyboard, the on-screen keyboard display. Lucent argues that concurrent display in that sense isn't enough, that you have to have overlaid windows, but the claim construction was quite clear that concurrent display means display at the same time as by an overlaid window. The district judge made very clear that that was an example that side-by-side display qualifies. The patent makes clear that the overlaid windows were shown illustratively as an example of concurrent display. That's in column three of the patent, I believe. That leaves only the question whether the indicating step, which we concede is not expressly disclosed in DataMation, would have been obvious to one of ordinary skill. Lucent's argument there amounts to the proposition that highlighting or use of a blinking cursor or something like that to provide the user with feedback indicating where on the screen he was working would not have been obvious. Mr. Trello, if we don't agree with you on obviousness, talk to us a little bit about damages. The entire market rule here, was it applied or were the damages, it seems to me the damages were quite in the middle of the ranges suggested by both sides' experts. I'm happy to talk about damages, Your Honor. The most fundamental problem with the damages award, before you even get to the whole question of was entire market value applied, does it apply here, is that the damages award bears no relationship to any actual showing of infringement. Section 284 requires damages to compensate for the infringement. And the award here doesn't do that. Dynacor held that where indirect infringement is at issue, both liability and damages have to be tied to the plaintiff's proof concerning the underlying direct infringement. We only have indirect infringement claims here. These are method claims and there's no allegation that Microsoft practiced the method. So when a plaintiff identifies individual instances of direct infringement, the liability for that and the damages are limited to those individual instances. Where a plaintiff identifies an entire category of infringers, to use Dynacor's term, then the damages can apply to that entire category. But in both instances, you have to show direct infringement. You have to show either that the accused product necessarily practiced the method, and if it didn't, then you have to show that somebody actually used it that way. So what do you do? Do you go into surveys of people's home usage? After all, there's other instruction manuals suggesting usage. Well, actually, if you look at the record sites that Lucent provided, you're not going to see the kind of instructions that would teach the use of the composition tool, which was the heart of their case as to Outlook in the trial court. But actually, surveys is a form of evidence that this court, I think, in Acro Brands identified as a possible form of evidence. Customer testimony would be another. And of course, Your Honor, you're only in that world, and that's the world we're in in this case, if the use of the product doesn't necessarily infringe. If the product has only one use, it can only be used to infringe, then you don't necessarily have the problem, at least not to the same degree. But here, where it's undisputed that these products have hundreds of non-infringing uses, you have to have some proof that somebody actually practiced the method. Well, the calendar doesn't have alternative uses, does it? The date picker tool does not have alternative uses. That's correct, Your Honor. But there's certainly no evidence that anybody ever used it. And you need that evidence. So I could, in picking a date, either type in the date or use the tool offered, if I prefer. So the former would be a non-infringing use. That's correct. You can type in the date. You could type in June 2, 2009. You could type in Christmas Day. You could type in Valentine's Day. You could type in next Thursday. You could type in tomorrow. All of those will give you a date without using the calendar tool, the date picker. And you're saying that the product literature, ads and so forth, instruction manuals, and other such documents, don't specify using the date picker tool that allows you to do it other than by typing in from the keyboard. No, I'm not saying that, Your Honor. What I'm saying is that there may well be instructions on how to use the date picker tool. But that does not lead to the conclusion that somebody did it. You have to conclude that somebody actually did it. And instruction, it's like, I think we used the example in our brief, if you have a map with multiple trails, and one of them goes through somebody's property and would cause you to trespass if you used it, you have to prove that the person actually used that trail. The fact that the instruction to use it was there doesn't prove that it happened. And there's no proof here that it happened. And that's the fundamental problem. And when you get past that, Your Honor, and then to turn to finally answer your question, Judge Lurie, the award numerically may be, I haven't done the math, but it certainly is in the range between Microsoft's figure of $6.5 million and Lucent's figure of, I think, somewhere in the neighborhood of $700 million. But the fact that a number is lower than the number the plaintiff throws out there doesn't mean it's supported by the record. Here, the only conceivable basis for this number is the value of the Microsoft products, the Outlook sales, Money sales, Windows Mobile sales. And even if this is some sort of a split the difference kind of calculation by the jury, still that means they used the entire market value because that was the one end of the range that if they were splitting the range, that's what they were doing. So either way, you've got the entire market value rule implicated here. The only other basis... Well, the entire market value rule, the sales base is related to the amount of royalty. So if you're using a smaller base and a higher royalty, it makes sense. You have a larger base and a lower royalty. Well, that's true as a matter of arithmetic, Your Honor. But doctrinally, I don't think that approach, which incidentally is the approach Lucent's damages expert essentially said he was using at trial. You can make one big and one small or do it the other way and get the same number. But I think the case law is very clear that there's a distinction between the two. While they're certainly related, and again, as a matter of arithmetic, you can get to the same place. So doctrinally, that's not the right approach. You only look at the total product revenues as the base if you satisfy the requirements of the entire market value rule, which is the accused feature or component or whatever it is, somehow drove demand for the product. Most of the cases, it was the basis for demand. Some cases suggest a substantial factor,  What do you think is really required? That it be the primary cause of the demand or more than a trivial cause of the demand or one of six major causes of the demand? Where do we end up here? Well, Your Honor, let me answer in two parts. First of all, in this case, I don't think you need to confront that issue because there's no evidence that it was one of six, one of 600. There is simply no evidence linking demand for these products to this feature. And why was it included? Well, Your Honor, it was included years ago before there was any awareness of this patent. There are hundreds of features in these software products. They're nice. Maybe somebody will use them. Most people probably don't. There was no reason to take it out. Is your answer to the Chief's question that if there are six features, then perhaps the damages should be calculated based on one sixth? Or you factor in the significance of the one which may be the basis for the demand for the product that may have been much more valuable than the other five? Well, I think it's not a question of counting up how many features there are and taking that fraction. I think you have to look at the particular feature at issue and say, did this, in some sense, create the value of the product? Wasn't there some testimony, whether it had a basis or another matter, wasn't there some testimony that the demand for Outlook did come from the claimed 8-picker, etc. features? No, Your Honor. What happened here is there was testimony that forms are important to Outlook. Tools are kind of nifty in Outlook. The convenient user interface is important. All of these things, and some of it may be true, but they're not the invention. That's the problem. The invention is limited to certain specified tools for filling out forms. That's exactly right. It has nothing to do with email or other uses of Outlook. Exactly, Your Honor. And that's an important point because Lucent's expert conceded at trial that you can, for example, you can send and receive email and you're not infringing this patent. And there was other uncontested testimony that the most important use, the thing that drives demand for Outlook, is email. That's what people primarily use it for. So you can't just take some feature and decide that it drives demand. And when you look at the feature, you have to focus on the patented feature. And that raises another point, Your Honor, and that is that on appeal, Lucent has fairly dramatically expanded its infringement theory. At trial, the theory was very narrowly limited. And I'm going to focus on Outlook because that's 85 percent or so of Lucent's damages claim. The testimony and the evidence was focused on the appointment form and using the date picker to fill in the form. Their expert testified very clearly, as Judge Michel noted, if you use some other method to fill in that date, you don't infringe. That's not the patented method. Now on appeal, they're taking the position that, well, as long as there's a composition tool somewhere in there, any use of any pop-up tool with any field will infringe this patent. On a form or on something else? Well, interestingly, although there's a lot of talk about form filling, Claim 19 doesn't actually say anything about a form. All it requires is that a plurality of fields be displayed. Now maybe that necessarily implies a form. I don't know. But the form, as such, is not in the claim. Let me ask you sort of a doctrinal question. You kept using the phrase doctrinally as a lead-in. What do you understand to be the purpose of the entire market value rule? That is, is it where the predicate is met? Of course, here you're saying the predicate's not. It wasn't the source of the demand. But assume a case where the predicate is met. I'm trying to understand what the function of the entire market value rule would be. And I can imagine that maybe the function is, where the predicate's met again, to start with the sales price of the product and then shift the burden to the infringer to start subtracting by that, by his having to carry a burden of proof. Well, our manufacturing costs were so-and-so and our distribution costs were so-and-so and all the rest. And therefore, that number starts going down, down, down. Whereas in the absence of the entire market value rule, perhaps, the burden is entirely on the patentee to start with zero and go up from zero to reach some sensible number. Is that your concept of what the purpose and function of the entire market value rule is? Not exactly. But what I would say is the fundamental purpose of the entire market value rule is to implement the statute, which is to award damages to compensate for the infringement. Sure. Now, when you get into the question of apportionment, it may be the case that, again, assuming the threshold conditions and all that, that then apportionment becomes an issue. But I guess where I would take issue with you, Chief Judge Michel, is on whom the burden rests. The Supreme Court in the Garrison case back in the 1880s, which is one of the origins of the entire market value rule, placed the burden of apportionment squarely on the patentee. It is the patentee's burden to prove the damages to which he is entitled. No question of that. Everybody would agree with that. So another way to phrase my question is a shortcut that allows the patentee to vault from zero to 100 percent of the sales price and thereby put the burden on the infringer to reduce that. Reduce that by saying a good portion of the sales is due to unpatented aspects of the product. But then I think, Your Honor, then you've gotten away from the premise that got you into this question in the first place. I mean, once you say that, that a substantial amount of the sales are attributable to other products, I'm sorry, other features or other patents, then you're not in the entire market value arena at all. That's the question. That's not so clear to me that you're right about that. You may be right. I'm trying to sort this all out. It's a very interesting area of the law it seems like to me. Well, as somebody who has recently read a lot of the papers... The basic premise is the patentee has to prove damages, even reasonable royalty type damages as opposed to lost products. We all agree with that. So then the question is, does he have to do that starting at zero or is the entire market value rule an exception that lets him not have to build and he still has the burden to build from the ground up? If the patentee... And let me take a step back. There's no question that if infringement is proven and the patent is valid, the patentee is entitled to damages. The patentee is entitled to the minimum reasonable royalty or to some other measure based on the value of what he patented. Now, if he's trying to get damages for something else, something much larger, then it's entirely appropriate that it be the patentee's burden to prove every step necessary to get that much larger reward. If that's true, maybe actually true, then why is there an entire market value rule? Because it would have no purpose. The patentee would always have to start at zero and prove constituent amounts to get to a total dollar figure. No, I don't think that's true, Your Honor, because you can imagine unpatented features or components in the product or features patented by somebody else, but they are insignificant. And it's the patented feature that really is the reason people buy the thing. So then the entire market value rule is for what I would say is an exceedingly rare case where the one chip in the thousand chip computer is the whole reason people buy that computer versus all the alternatives. It's going to happen once a decade maybe. Well, I don't know if it'll be a freaky case. I don't think it's going to be the norm. When you have multi-featured, multi-component products, I think it probably will be fairly rare that you can point to one of those features. So then excluding that case, whether it's a tenth of a percent or one percent or whatever, we don't know. But that thin slice covered by the entire market value rule, every other case requiring a patent on it. Every other case requires some proof of what this patented feature is worth. Comparable license agreements, to the extent that the thing is in some other context sold separately, what have you. Cost savings that it makes possible. There are a variety of ways you could do it. But basically the patentee has to prove what value was added to the total product by the claims invention. Exactly. I think that's exactly right. Methods may be different. Now let me ask you this. A little bit different aspect of this entire market value rule subject. If the entire market value rule properly applies, then you are working with the entire market value figure of product sale price, at least as a starting point. But in the absence of applying the entire market value rule, let's assume the predicate isn't shown, isn't it appropriate to use the sales price of the overall product, only one component of which is patented, if there's no other number that's known, that's available? No. Never appropriate to use the total sales price. I think once you, when you have failed to satisfy the requirements of the entire market value rule, I think at that point, the value or the price of the total product is off the table. And there have to be other ways. Why couldn't you use the total product price if the patentee retains the burden to establish what portion of that total price he's entitled to because he can show that it corresponds to the value added by his invention compared to all the other features? Well, maybe I was just having a semantic disagreement with you then. I think, I suppose you can imagine a technique where the patentee is able to estimate or come up with some calculation of the value of his feature based on the value of the overall thing. That may well be possible. If you have a very high base, if you have a very low percentage, you could get the same figure as with a smaller base and a higher percentage. And therefore, to the extent we're trying to prevent an outsized award, even if you start with the total product price of a one-component infringement, as long as the multiplier, the percentage, is low enough, you would get a rational award, right? You could arrive at the same arithmetic results. But I think what you're proposing, Your Honor, throws the entire market value rule out the window. Because you can always say, well, we can have the world be our wealthy base, but if we make the rate low enough, everything will work out fine. And maybe as a policy matter, maybe that's, if you were designing a system from scratch, maybe that's what you would do. But that's not the system we have. The Supreme Court, in decisions, as I said, going back to the 19th century, made it very clear that the entire market value rule is, in fact, a rule. And that's what we're dealing with here. And so, fiddling with the numbers so that you get out, arrive at what you think is the same result, is not the appropriate way to proceed. Mr. Troll, it seems to me we're thinking of the entire market value rule differently in this context than we have in the past. We're talking about a larger sales price and working back. I'm thinking back to right height, where I think we applied the entire market value rule, which we didn't originate there, obviously. And the point there was add-ons. Add-ons to the basic infringing product. And I think, not to characterize our holdings in public, that we've probably tightened it up a little bit by saying there had to be a functional relationship. That's a different, that's a probably more traditional application of the entire market value rule. Is it not? Then what we're talking about here, instead of we were adding on then, or perhaps the law had added on then to formulate the entire market value rule, whereas here we're scaling down. Well, I think, I think it's probably true that at the time of Wright Height, that was the more common scenario in which you'd see entire market value questions. I'm not sure that's true anymore, Your Honor. I think cases like this one, a single product, no add-ons, but with a multitude of features, is the supposed accused product. Couldn't Wright Height be interpreted as being better characterized not as an entire market value rule case, but as a convoy goods case, where you had two or more separate products, one of which infringes, and then the additional products don't infringe, but because they're all sold together, you allow the patentee to get the total economic value of the multi-product package. I think that's a fair reading. Now, of course, you do have, as Judge Lurie mentioned, the functional unit notion, which But that would be a predicate of combining several products. Right. But in our case, we only have, this case, we only have one product. We have one product. So it seems that the Wright Height convoy goods discussion doesn't help us in this case. I think the convoy goods discussion is  directly applicable, but to a large extent, what Wright Height was doing, I think, was synthesizing the entire market value rule as it had evolved. Even for a product that was patented, there was no question about that. So it is hard to draw the answer. Right. I think in Wright Height and It was a question of convoy sales. Right. You had an entire product, and the entire product was patented, unlike here, and then you also had the question of things that were typically sold and used with it. This is an irrelevant observation, but it's just true. And in the intervening years, we've had very few cases that really plumbed the expanse of these rules, the entire market value rule, apportionment, how you do the calculation, who has what burden. It's kind of amazing that since patent cases are heavily, not exclusively about damage, but heavily about damages, also in Johnson's, of course, but heavily about damages, that at this late date, all these years later, 27th or 28th years in the existence of this court, there still seems to be massive unclarity about how reasonable royalty damages are to be calculated. Well, Your Honor, I think there is, I'm not sure that there's a tremendous lack of clarity. I do think that in cases like this one, the application of the entire market value rule is fairly clear, and certainly there are nuances, and you can imagine situations in which questions might arise, and those questions obviously have to await the proper case. This case, I would submit, is a simple case in that regard. And also, Your Honor, and not to beat a dead horse, but I do think you don't even get to this because of the lack of proof of direct infringement here. You clearly have to have direct infringement. Isn't it your view that in terms of direct infringement damages, that you would have to quantify how many different people used the method how many times, wherever those computer users might be all over the world? I think you would have to, and I'll use that. That's your view, isn't it, that you would have to quantify the actual uses in order to calibrate the damages? I think you would have to quantify, and I don't mean to the last person necessarily, but you would have to quantify the number of product units that were used to infringe. Now, whether customer A who bought it used the patented method once or ten times, I don't think that  fact that the product was sold and was used to infringe. So if 110 million people bought Outlook, is there 110 million people who bought Outlook? People who've got that on their computer, 110 million people have that on their computer. So the patentee would have to show how many of that 110 million, once or more, used the patented feature. Yes, that's correct, Your Honor. Absent that, there would just be zero damages, in your view. That's correct, Your Honor. But doesn't that create an extremely difficult burden as a judge?   Honor. I think it's important to recognize that you're only in this boat to the extent that the product does not have substantial non-infringing uses, which these products obviously do. So you take away that whole slew of cases as not contributing to the problem, at least not in the same way. But again, as to return to the Court's references in ECHO, I think you can use survey testimony, you can get testimony from customers, and again, you don't have to march 110 million people through a courtroom. Juries make these kinds of decisions all the time. Clearly, circumstantial evidence is adequate, and if you have statistically valid surveys or sufficient testimony from large corporate users, for example, a jury could draw an inference that 80% or 50% or what have you. How about here? Is it your view that there was no proof of particular uses by software possessors of the patented method? That's exactly our view, Your Honor. So zero damages in your view? Yes, Your Honor. Then why did your expert admit that the reasonable royalty would be 6.5 million, if I recall? Well, Your Honor, our expert, as any damages expert does in a case, assumes infringement, assumes that the jury has found infringement, and offers his damages testimony. And he assumed validity too, and we would not attach any significance to the fact that we presented a damages case. So is it your view that liability and quantifying damages are in absolute lockstep, that they have to be scaled by proof somehow of actual use of the patented method? Yes. I think Dynacor holds that. I think DSU holds that. We have a very interesting case before us. We look forward to your insights. Good morning, Your   we've spent all of this time on damages, and we only gave Mr. Treloar a few moments on validity. But I think there are a  questions about validity. Could you start with a few moments on your position on validity? Yes, Your Honor. That's where I intended to start. Today, as we all stand here, computerized forms and pop-up menus and calendar tools are ubiquitous. And that's one of the things that makes this case very interesting. This is the age-old case of an obvious analysis where we have to put ourselves back in time 25 years before Microsoft Windows, before Apple Computer was a home name, before everyone had their iPods. Now, everybody's using pop-up tools. When this patent was invented, almost 25 years ago, nobody was doing pop-up tools. What the patent tried to do at the time was addressing the problem of how do you fill out these forms without using a keyboard in some sort of efficient way that users could use. The question is that nobody because there was the distinction that I've been interested in. That's exactly where I'm going, Your Honor. There's a fundamental difference between those two things, the patent and what was in the data article. The patent was addressing the issue of how do you fill out on a computer screen a form, go from field to field in the form, and get the information in an efficient way with pop-up tools relevant to each field, indicating which field you're working in. When you're done, you're going to have a nice well-filled out form, eliminate the mistakes. That is not what's being described in the publication. The publication was after something else. Meaning what? That it's not relevant at all? That's not where I was going. I'm going to tell you what it was after and then tell you why that means the limitations are missing. It brings to life the limitations that are missing, and that's where I'm going. So what they were trying to do in the system describing the data article was traders are making complete forms and fill out forms. So when you read the article to see what's disclosed, what they talk about is pushing the sell button and a tool pop up. That goes into the system and they move on to the next one. They are not filling out a form. It's not for this reason, Your Honor. If you think about what you do, first of all the claim requires a plurality of forms, but even more importantly, a common example today is an ATM machine. If you go to an ATM machine today and you want to make a deposit, you push a deposit button, a number pad, you put in the amount you want to deposit and that gets submitted into the system. You are not when you are doing that filling out a deposit form. You are not putting in your name, bank account, bank number, address, amount of deposit. You are merely pushing a deposit button, entering the amount that goes into the system that gets processed. That is analogous to what was going on in the data machine publication. Why is this relevant? If you look at the claim limitations, what the claim limitations talk about is the first claim limitation that is not displayed is the tool. You put in the information and the information goes into the system. It does not go on to the display. There is no disclosure about going on to the display. I'm going to go one by one through the elements. First of all, there is not a plurality of fields displayed on the display. You can read that article cover to cover. The third limitation. The fact that the article talks about a single number going into a one field form, if I can use the terminology, it would be very easy to extrapolate that to a multi-field form. Even though now you're going to put in eight pieces of data instead of one piece in one place. Put yourself back 25 years ago. I was still in college working with a terminal on a mainframe in text mode. We had no graphics on the computer. We had no pop-up tools. We had none of that. I'm not saying it's obvious or not. I'm saying wouldn't it be easy to extrapolate from the one field situation to the multi-field situation. You would just use the same technique in a plurality of places instead of in one place. What they were doing in the prior reference was not filling in a field in a form. They were typing in the cell information into the tool that popped up. It wasn't even a field on a form. All it was was a display on the screen of fields that constitute a form. That wasn't the intent of the prior publication. Going on to the third limitation, it's indicating a particular field. Again, entirely lacking. Microsoft admits it's lacking. It's lacking for the reason that that publication was going after something else. In the patent, you're filling out a form on a screen that has a lot of fields. It's important to indicate which one you're working in so you know. That has nothing to do with the prior publication. This is a one reference obviousness issue. That article is the only reference. Go ahead. Last limitation. Last one I'm talking about. Inserting one information field that is derived as a result of said user operating tool. Number one, you have to have a form with multiple fields. The last limitation, inserting into that field, that's lacking. All the article says is you're going to use the tool, it's going to go into the system. It doesn't talk about forms, plurality of fields, indicating or indicating the user. The goal here, in fact, what's described in the patent, is a typical rental car agency where you've got a detailed form about how many cards you're going to fill in. You put in the person's name. The basic goal is to get it done quickly and accurately and simply. It's the same as the goal for the traders. The traders were not interested in filling out forms. They were interested in quickly digesting information. That's why they                 didn't want to  The reason why they didn't do it was because they didn't have the tools to do it. The reason why they it was  they didn't have  tools to do it. tools to do it was because they didn't  the tools to do that was the reason they didn't have the tools to do it was  they didn't have the tools to do it that was the reason they didn't have the tools to do it was the reason they they  have the tools to tools to do it    they     do it was  reason they didn't have the tools to do it was the reason they didn't have the tools to do it was reason  it was reason  didn't have the tools a tools to do it it was reason  didn't have the tools to do it they didn't have the tools to do it it was reason they excuse